## Ohio Valley Electric Railway Company v. Brumfield's Administrator.

(Decided May 28, 1918.)

### Appeal from Boyd Circuit Court.

1. Railroads—Federal Employers' Liability Act.—An employee of a railroad company cannot recover damages for injuries sustained under the Federal Employers Liability Act unless he was engaged in performing a service in aid of interstate commerce, or so closely related to it as to be practically a part of it.

2. Railroads—Federal Employers' Liability Act—When Employee is Engaged in Interstate Commerce.—An employee of a railroad engaged in interstate commerce is himself engaged in such commerce if he is assisting in strengthening or making more secure an embankment over which the interstate trains run.

3. Railroads—Federal Employers' Liability Act—Instructions on Measure of Damages.—It is not indispensable that an instruction, on the measure of damages, should limit the jury to finding the present cash value of the assessment, and especially is this so where the railroad company fails to offer an appropriate instruction on this subject.

HAGER & STEWART and GEO. B. MARTIN for appellant.

JOHN W. WOODS for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The Ohio Valley Electric Railway Company owns and operates a line of electric railway in the states of Kentucky and West Virginia, and at the time Brumfield received the injuries out of which this litigation arose, the railway company was admittedly engaged in interstate

commerce; whether Brumfield was engaged in such commerce at the time he received the injuries complained of, although he was then an employee of the railway company, is one of the principal issues in the case. Brumfield, since the judgment appealed from was rendered, has died and the action is now being prosecuted by his administrator, and it is the contention of the administrator, as it was the contention of Brumfield during his life that he was engaged in interstate commerce at the time, when as an employee of the railway company, he was injured, while the railway company insists that Brumfield was not employed by it in interstate commerce at the time.

There is no difficulty about the law upon this point, because an action by an injured employee to recover damages under the Federal Employers' Liability Act cannot be maintained unless the ralway company was at the time engaged in interstate commerce, and he was, at the time the injury complained of occurred, engaged by it in such commerce. When, however, it comes to applying the law to the facts of the particular case, it is often a matter of serious difficulty to determine whether the injured employee was, at the time he received the injuries complained of, employed by the interstate carrier in a work connected with interstate commerce, and this question must, in every case, be determined by the facts of the particular case.

Therefore, we will relate, with some particularity, the facts of this case for the purpose of ascertaining whether Brumfield, when injured, was employed in interstate commerce.

The railway company operated an electric railway running from Ashland, in the state of Kentucky, to Huntington and other points, in the state of West Virginia, and it is conceded, as we have said, that in July, 1914, when Brumfield sustained the injuries that were the basis of this suit it was engaged in interstate commerce. Brumfield, at the time, was what might be called a section hand, or trackman, and as one of a crew of men, was engaged, with the other men, in helping to move a lot of old and worthless ties from where they had been thrown by the side of the track of the railway company in Huntington, to a fill on its line of railway between Huntington and Ashland. On this line of railway, between these points, there had formerly been a trestle, but

a few years before the accident to Brumfield, the railway company had made an embankment or fill to take the place of the trestle, and in making this fill it used ties, cinders, ashes and other refuse picked up at different places on its line.  After the fill had been sufficiently constructed to permit the passage of cars over it, it continued to dump on the sides of it ties, ashes, cinders and other refuse gathered at different places along its line for the purpose, as contended by Brumfield, of strengthening the fill; while the railway company contend that it dumped this matter there not to strengthen the fill, but because it was a convenient place to dispose of useless stuff.

Brumfield, and his crew, on July 14, 1914, loaded a truck with the old and worthless ties picked up along the track of the railway in Huntington, and run the truck out on this fill for the purpose of throwing the ties off the track on the side of the fill, and it was while engaged in unloading the truck, at the fill, that Brumfield received the injuries that subsequently resulted in his death.

At this point, it is convenient to say that Brumfield testified on the trial of the case, but died after judgment for $10,000.00 had been given in his favor, and so his administrator is the appellee on this appeal.  It may also be here said that the railway company is not making, on this appeal, any question about the size of the verdict, or that the injuries sustained by Brumfield were not caused by its negligence.

Coming now to set out in more detail the evidence as to the purpose for which these ties were being dumped at the fill, Brumfield testified, in substance, that he was a section hand, working with a section crew, doing such things as were needed in the repair of the track; that the crew would haul old brick and dirt and ties from places where they had been thrown by the side of the track to the fill and, he understood, that the purpose of putting the ties and other stuff at the fill was to widen and strengthen the road bed at that place; that before the day of his injury, he had helped to unload, at this fill, rock, dirt, ties and other stuff, carried from different places on the line; that a great many other ties he had helped to unload there, and thrown down the side of the fill, had been covered up with ashes, cinders and other refuse; that by the use of this material, in this way, the fill was

made wider and in fact, at the time of the trial, was about two feet wider than at the time he was hurt. William Gunther, who had worked for the railway as a foreman from 1900 until March, 1914, testified, in substance, that when the culvert was taken out and an embankment made in its place, cinders, dirt, ashes, ties and other kinds of rubbish were used in making the fill; that ties thrown over the embankment would be covered up with the other rubbish; that after the cars commenced running over the fill it was made wider by ties and other rubbish thrown on the sides; that the purpose of widening the fill was to make it more substantial.

M. D. Schaffer, who was supervisor of the tracks of the company in 1914, testified: "Q. What were your duties with reference to the track at that time? A. Well, I had that part of it to look after, keep it in running condition, and also had the new work to take care of, if they built any new line, or anything of that kind. Q. Look after the making of the fills? A. Well, yes. Q. And take care of the refuse and ashes and things of that kind? A. Yes, to a great extent. Q. What was it customary to do with the ashes and refuse ties that you got out of the track where you was changing? A. Well, they went to make fills mostly. * * * Q. Now to refresh your memory I will ask you if Mr. Magoon didn't give you some orders about 1914, July, with reference to the putting of the stuff in this fill that had been cleaned up along the track, putting it in this fill at Camden Park? A. Yes, he always wanted everything put in there. Q. What for? A. Well, in the first place to keep—to protect the fill. Q. Were the ties put in there for the same purpose as the rest of the material was? A. Yes, sir. Q. State whether or not in July, 1914, along there, you put material into this fill for the purpose of protecting it and strengthening it at that point? A. I can't say at that time, of course, but before that, I can't say that it was, no sir. At this particular time, I don't know, I can't say that it was absolutely necessary; they put it in there and had been throwing the stuff there for a number of years, I don't know how long a while; of course the order never was annulled. Q. When was the order annulled? A. I believe it was about last March, a year ago some where. Q. About March, 1915? A. Yes, I think it was March, as well as I remember. Q. Now you say it wasn't necessary to put stuff in there to protect

the fill, what did you mean, now in July, 1914? A. Well, I judge it was not in any sense necessary to protect it. Q. Was not? Do you know how it was at that time? A. I don't know about that; as I said they had been putting stuff in there for a number of years and the order had never been countermanded and stuff was still being put in it. Q. Up to what time? A. Up until last March. Q. Since July, 1914, how much stuff have they put on that fill on the south side next to the river? A. Well, I can't say. I don't know how much, considerable, they have hauled ties there and have hauled dirt there and they hauled ashes there. Q. State whether or not they covered up the ties put in there in July, 1914? A. O, yes, covered up a good many of them. Q. Tell the jury what order, if any, you had from Mr. Magoon with regard to cribbing the ties put in there? A. Yes, he called my attention to that, said to me to have the men crib the ties in there to protect the fill—to keep the water from it? Q. What do you mean by cribbing ties? A. That is to pile them in a manner so that they would hold the dirt at the foot of the fill, cross pile them at the foot of the fill. Q. What did you do with the dirt then? A. The first then, it would go down to the ties and catch there and hold instead of going on and leaving them. Q. That protected the fill didn't it? A. Yes, supposed to."

For the railway company Fairchild, Harris, Humphrey, and other witnesses testified that these old ties and other rubbish were thrown over the banks of this fill merely because it was a convenient place to get rid of such useless rubbish, and not with any purpose of strengthening or making safer the fill.

With the evidence on this issue in this condition, the court told the jury that if they should "find and believe from the evidence that the old, refuse ties that were being unloaded from the defendant's car by the plaintiff, and other servants of the defendant, at the time of the accident in question were to be used in repairing or strengthening the fill at said point and were unloaded there by defendant for said purpose, then and in this event plaintiff and defendant were both engaged in interstate commerce at the time of the accident; and on the other hand if the jury shall believe from the evidence the defendant or its servants in charge of the work of unloading said ties at the time and place in question threw them on or over the top of the fill in question as

an easy or cheap way to get rid of them and without any purpose or design to repair or strengthen said fill, then and in this event the plaintiff and defendant in doing said work were not then engaged in interstate commerce and the plaintiff is not entitled to recover under said act.''

It will thus be seen that the instructions clearly directed the minds of the jury to the issue between the parties as to whether Brumfield was engaged in interstate commerce, and the jury, under the evidence and instructions, found that Brumfield was engaged in such commerce. Whether he was or not depended on a disputed question of fact, and we think there was sufficient evidence tending to show that these ties and the other rubbish were put at this fill for the purpose of strengthening and making it safer to warrant the jury in finding for Brumfield upon this issue as they must have done, or otherwise their verdict would not have been in his favor.

Our attention has been directed by counsel for the railway company to several cases that, it is contended, support their position that the evidence was not sufficient to take the case to the jury upon the ground that Brumfield was engaged in interstate commerce and, therefore, the court should, at the close of the evidence, have directed the jury as requested to return a verdict for the railway company, and these cases we will now proceed to briefly notice and point out what we conceive to be the material difference between them and the case we have.

In Illinois Central Railroad Company v. Kelly, 167 Ky. 745, it appears from the opinion that Kelly, a track repairer in the service of the company, was engaged in loading on a flat car, from its right of way, unused rails which had theretofore been removed from its track and left on the right of way beside it, and it not appearing that these rails were being removed for the purpose of using them in any manner or way connected with interstate transportation, the court held that Kelly, in merely removing old rails from a place where they had been put, was not engaged in interstate commerce. But further said: ''If appellee had been injured while unloading rails that were to be used, and were later used, in repairing appellant's railroad track, there could have been no doubt of his right to maintain the action under the Federal Employers' Liability Act; but such was not the case.

The rails, by one of which he was injured, had been removed from the track and new ones put in their places several days before he was injured. When taken from the track the old rails were laid out on the ground or sub-grade, outside of and parallel with the track, the space occupied by them being about four feet in width; and, as thus placed, they could not, even if allowed to permanently remain, have interfered with appellant's use of the track or its business as a carrier, and there was nothing in the evidence conducing to show that it was the intention of appellant to use these rails in its track elsewhere or that they were so used or even fit for such use. In view of this situation, we are unable to see how the later work of gathering up these old rails for the purpose of storing them elsewhere, or, perhaps, selling them as scrap steel, can in any sense be considered as a repairing of the track, or as necessary to appellant's engaging in interstate commerce. In other words, the evidence fails to show that there was any duty resting upon the appellant as a carrier of interstate commerce to remove the rails."

In Cincinnati, New Orleans & Texas Pacific Railway Company v. Hansford, 173 Ky. 126, it appears that Hansford, an employee of the company, was injured while loading, on a flat car, unused steel rails which had theretofore been removed from the track and left on the right of way, and the court held that it could not be said that Hansford was engaged either in interstate transportation or any work so closely related to it as to be practically a part of it, saying: "It will be observed that it nowhere appears that Hansford was engaged either in taking out old rails or putting in new rails; the most that can be said from the proof is, that Hansford was engaged in loading old rails, that had, at some time, been taken out of the track and were lying on the right of way."

It will be seen that in each of these cases, although the employee was engaged, at the time of his injuries, in removing old material from an interstate track, it did not appear that any part of this old material was being removed or rehandled for the purpose of using it immediately in connection with interstate transportation, but in the case we have, the old material that Brumfield was assisting to remove was immediately taken from the place where it was found to the place where it was to be

used, according to the contention of Brumfield and the finding of the jury, in interstate transportation, and Brumfield was injured while assisting in unloading the material at the place where it was needed in such transportation, and, therefore, the cases relied on are not applicable to the facts of this case.

We think there can be no doubt about the proposition that if these old ties were being thrown over the embankment for the purpose of strengthening or making it safer for use in interstate transportation, that Brumfield, when injured, was engaged in such transportation, or in work so closely related to it as to be practically a part of it. It is not indespensable that the employee shoud be engaged in interstate transportation in the sense that he was assisting in the operation of a train engaged in such commerce, or in the repair of trains, fixtures, appliances or tracks, the repair of which was, at the time, indispensable or necessary in the conduct of the interstate transportation business. As said in Shanks v. Delaware Railroad Company, 239 U. S. 556, 60 Law Ed. 436, the test is "Was the employee, at the time of the injury, engaged in interstate transportation or in work so closely related to it as to be practically a part of it." And plainly, an employee performing service in connection with the track, or the embankment on which the track is laid, is engaged in work so closely related to interstate transportation as to be practically a part of it. Because it is just as necessary that embankments upon which the track is laid, on which the cars run, should be made safe and secure as that the engines and cars should be safe and secure; therefore, the repair of an embankment, over which trains used in interstate transportation run, is just as much a part of interstate transportation as are the rails and ties and cars themselves.

Thus it was said in Pedersen v. Delaware Railroad Company, 229 U. S. 146, 57 Law Ed. 1125, that: "Tracks and bridges are as indispensable to interstate commerce by railroads as are engines and cars; and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair. The security, expedition, and efficiency of the commerce depends in large measure upon this being done. Indeed, the statute now before us proceeds upon the theory that the carrier is charged with the duty of exercising ap-

propriate care to prevent or correct 'any defect or insufficiency . . . in its cars, engines, appliances, machinery, track, road-bed, works, boats, wharves, or other equipment' used in interstate commerce. But independently of the statute, we are of opinion that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and in legal contemplation a part of it.'' In that case it was held that an employee of an interstate railroad, killed while carrying a sack of bolts or rivets to be used in repairing a bridge which was regularly used in interstate and intrastate commerce, was employed in interstate commerce within the meaning of the Federal Act, and this case was referred to with approval in the Shanks case, *supra*.

The remaining question relates to the instruction given by the court on the measure of damages. On this subject the court told the jury that if they found for Brumfield ''in fixing the damages, if any, allowed for such impairment or loss of his ability to labor and earn money they will fix same at a sum of money that will represent the present cash value of such labor and any money that might be earned thereby so far as it may have been impaired or destroyed by reason of said injury, if any. In the event the jury should find for the plaintiff and also allow him anything for time lost from his avocation or labor, and allow him anything for any impairment or loss of his ability to labor and earn money, then and in this event they will not allow him anything for such impairment or loss of his ability to labor and earn money until after and subsequent to the time allowed him as lost from his avocation and the entire recovery in no event to exceed the sum of $25,000.00, the amount claimed in the petition.''

The objection urged to this instruction is that it does not conform to the rule laid down by the Supreme Court of the United States in Chesapeake & Ohio Railway Company v. Kelly, 241 U. S. 485, 60 Law Ed. 1117. In that case the railway company requested an instruction directing the jury to ''fix the damages at that sum which represents the present cash value of the reasonable expectation of pecuniary advantage . . . to said Addie Kelly during her widowhood and while dependent, and pecuniary advantage to said infant children while dependent and until they become twenty-one years of age,''

and the court said that an instruction presenting the idea that the assessment should be made on a present cash value basis should be given, and directed a new trial because of the failure of the trial court to give the requested instruction or one presenting the idea outlined by the court.

In this case, however, the railway company, although it saved an exception to the instruction given, did not offer any instruction on the subject of the measure of damages, and as the instruction complained of told the jury that they could only find such damages as would represent the present cash value of such labor or money as might have been earned by Brumfield, except for the impairment or destruction of his power to earn money caused by the injuries he received, this instruction, although perhaps not worded in the precise phraseology contemplated by the court in the Kelly case, was not so substantially wrong as to constitute reversible error, especially in view of the fact that no instruction presenting the view urged by counsel in brief was offered.

Upon this point, we said in Illinois Central Railroad Company v. Skinner's Admx., 177 Ky. 62, in considering a like question, that: "The instruction given in the instant case is correct, except that it does not expressly limit the recovery to the present value of future payments by deceased to his dependents; nor does it exclude that idea, for it directs a return in such a sum as would "reasonably compensate" deceased's dependents for their loss, which easily might have been construed by the jury as being done by awarding only the present value of future payments; in fact, that is what it does mean; and the verdict returned may have been reached upon that idea, since deceased's proved earning capacity and life expectancy might have supported a larger verdict, although the loss was reduced to its present value. Under such circumstances, if defendant desired a more specific instruction upon the question of present value it should have offered such an instruction, and having failed to do so cannot now complain."

In Cincinnati, New Orleans & Texas Pacific Railway Company v. Jones' Admr., 177 Ky. 485, we also said, in response to the criticism of an instruction upon the measure of damages upon the ground that it did not conform to the rule laid down in the Kelly case that: "It is true that this instruction did not give the jury any criterion by which they should estimate the present cash

value of the sum to be awarded as damages, nor do we know that it was necessary that they should have been specifically instructed upon this point. In fact, it would be rather difficult to draft an instruction furnishing a formula as to the present cash value that would be helpful to the jury or assist them to fix the damages according to this measure with any sort of accuracy. When juries of plain men in cases like this come to determine the amount of damages that should be awarded, they cannot well be intelligently guided by scientfic or mathematical rules. In the very necessity of things they must take a general survey of the case and determine from all the facts and circumstances before them what would be reasonable and fair compensation to the dependents for the pecuniary loss sustained by them, and when they are given a general direction to fix the damages at such a sum as would be equivalent to the present cash value of the loss sustained, and are assisted by such competent evidence as the parties may offer, they must be trusted to ascertain in their own way what the present cash value of the loss would be.''

A case directly in point, holding that the instruction given by the court was substantially correct is Louisville & Nashville Railroad Company v. Holloway, decided by the Supreme Court of the United States, in April, 1918, and reported in L. R. A. advance sheets, issue May 15, 1918. In that case the instruction given was: ''The measure of recovery if you find for the plaintiff, being such an amount in damages as will fairly and reasonably compensate the widow of the said John G. Holloway, deceased, for the loss of pecuniary benefits she might reasonably have received if the deceased had not been killed, not exceeding the amount claimed, to-wit: $50,000,'' and an offered and refused instruction read as follows: ''The court instructs the jury that if they shall find for the plaintiff, their verdict cannot in any event, exceed a sum which will yield, at interest at 6 per cent., a sum which will represent the proven pecuniary benefits which Mrs. Halloway received from her husband in his lifetime, and had reasonable expectation of receiving from him if he had not been killed. And the court further instructs the jury that the amount so awarded by them should be diminished by such amount as that, by using the interest and a part of the principal sum each year, the principal sum will have been ex-

hausted at the expiration of decedent's expectancy of 28.62 years.''

In holding that the trial court did not commit error in giving the instruction, or in rejecting the offered one, the court said: ''The instruction given, though general, was correct. It declared that the plaintiff was entitled to recover ''such an amount in damages as will fairly and reasonably compensate 'the widow' for the loss of pecuniary benefits she might reasonably have received but for her husband's death. This ruling did not imply that the verdict should be for the aggregate of the several benefits payable at different times, without making any allowance for the fact that the whole amount of the verdict would be presently paid at one time. The instruction bore rather an implication to the contrary; for the sum was expressly stated to be that which would 'compensate.' The language used was similar to that in which this court has since expressed, in Chesapeake & O. R. Co. v. Kelly, *supra,* p. 489, the measure of damages which should be applied. The company had, of course, the right to require that this general instruction be supplemented by another calling attention to the fact that, in estimating what amount would compensate the widow, future benefits must be considered at their present value. But it did not ask for any such instruction. Instead it erroneously sought to subject the jury's estimate to two rigid mathematical limitations: (1) That money would be worth to the widow 6 per cent., the legal rate of interest: (2) that the period during which the future benefits would have continued was 28.62 years —the life expectancy of the husband according to one of several well-known actuarial tables. The company was not entitled to have the jury instructed as matter of law either that money was worth that rate, or that the deceased would not in any event have outlived his probably expectancy.''

Our attention is called to what are claimed to be verbal inaccuracies in the instructions, but we do not regard the error, if any, in this respect important.

The judgment is affirmed.