## The Cincinnati, New Orleans & Texas Pacific Railway Company and J. W. Wyatt v. McWhorter.

(Decided April 22, 1924.)

### Appeal from Boyle Circuit Court.

1. Master and Servant—Proof Brakes Did Not Work Not Evidence of Negligence.—In an action by railroad employe who jumped from train, proof that air brakes on train did not work was not proof of actual negligence by master, it appearing that the brakes worked all right both before and after that time.

2. Master and Servant—Evidence Held Insufficient to Raise Issue of Negligence of Tower Man After Discovery of Trainman's Peril.—In action for personal injuries by railroad employe who jumped from train running away because semaphore signal was turned against train, evidence as to negligence of tower man in failing to show a clear track after discovery of plaintiff's peril held not sufficient to warrant submission of issue to jury.

3. Master and Servant—Negligence of Tower Man in Not Indicating Open Track Held for Jury.—In an action by railroad employe for injuries received when he jumped from runaway train because semaphore signal indicated danger, whether tower man was negligent in not indicating clear track, in compliance with order of train dispatcher, held for the jury.

4. Commerce—Engineer and Tower Man Held Engaged in "Interstate Commerce."—Where cargo on train was being transferred from Tennessee through Kentucky to Ohio both the engineer and tower man, operating a semaphore when the train passed, were engaged in interstate commerce.

5. Master and Servant—Coemploye Improperly Joined as Defendant in Action Under Federal Act.—Federal Employers' Liability Act (U. S. Comp. Stats., sections 8657-8665) gives no right of action against an individual, consequently alleged negligent tower man was improperly joined with railroad as a party defendant.

6 Appeal and Error—Objection of Misjoinder on Appeal too Late.—Objection for misjoinder of parties comes too late when made for the first time on appeal.

7. Evidence—Admissions of Servant Not Admissible Against Master.—Admissions of servant contained in a conversation, narrative in form and not a part of the res gestae and made after an accident, are not admissible against the master.

MAURICE L. GALVIN, EDWARD COLSTON and CHAS. H. & NELSON D. RODES for appellants.

HENRY JACKSON, GEORGE STONE, JAY W. HARLAN and JOHN D. CARROLL for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

The C., N. O. & T. P. Railway Company owns and operates a line of railway in the states of Kentucky and Tennessee, passing through a mountainous section between Somerset, Kentucky, and Oakdale, Tennessee. From the CD tower to KD tower in Kentucky, a distance of 4½ miles, there is a double track. At the latter point the lines converge and run northward over a single track, the switch being a short distance to the north of the tower. There is a deep cut to the south and an approaching train is not visible until it is within six hundred feet of the tower.

Beginning at a point midway between these towers is the crest of a ridge with a down grade extending northward on a double track to a switch at KD tower and then on the single track for several miles. The western track is used by the southbound trains, which normally have the right of way. The northbound trains using the eastern track receive orders at KD tower before passing on the single track, and generally stop at that place for inspection, though in case a stop and inspection are made before reaching that point they may pass on if the trac⁷ is open. At this place is established a block system of switching and signals, operated by levers located in the tower.

There are two signal posts. The first is about one mile south of the tower and the other a semaphore, just a

few feet south of it, both being on the east side of the track and both operated by the same lever at the same time.

In the day if the arm of the semaphore raises perpendicularly it signifies that the northbound train has a clear track, while if it is extended horizontally it means that the track is closed, and at night green signifies a clear track and yellow and red signify a closed track—danger.

On March 6, 1921, G. H. McWhorter, an experienced engineer, was in charge of a northbound freight train which left Oakdale in the afternoon. Before leaving, the air brakes were tested and found all right, and the trip for sixty or seventy miles proceeded without incident, the train being stopped on several down grades. It passed the crest of the ridge above mentioned just south of Greenwood, Ky., traveling at the rate of twenty-five or thirty miles an hour. Shortly thereafter McWhorter undertook to check its speed and discovered that the air brakes on the cars were not working. He made a second attempt with the same result, and thereupon whistled for the hand brakes. At the time the conductor and one brakeman were in the caboose and the fireman and head brakeman were in the engine. This brakeman responded to the call and started back to assist in setting the brakes. The engineer placed the engine in emergency and sanded the track. In the meantime the fireman undertook to reverse the engine and his hand was caught between the lever and the boiler. The engineer was unable to extricate him and recalled the head brakeman to assist and the two succeeded in releasing him. While this was going on they passed a southbound freight train, the noise of which possibly prevented the conductor from hearing the brake signal. Realizing that the block was against them at the passage of this train and not knowing whether it had been changed the three watched for the first signal. It showed yellow. A sudden emergency faced them. If the block was against them an open switch led into a deep ravine just north of the tower and a derailment, with consequent piling on the engine of the cars in the rear was fraught with the greatest danger, but if the block was open a clear track meant safety; they still hoped for this and decided to watch for the semaphore signal and if it was clear to ride the train through, otherwise to avoid the peril by jumping.

The momentum of the train was increasing and had reached a speed of forty to forty-five miles an hour. As they approached the semaphore no light was visible and they waited until they could discern its position. Watching closely at the skyline they caught a glimpse of it standing with extended arm. This was the danger signal and thereupon they jumped from the train, McWhorter receiving serious injuries.

The operator Wyatt was also an experienced man and had operated the tower for — years. According to his statement he reported the southbound train upon its passage and while seated at his desk received the signal of the approach of McWhorter's train. This signal was given by the train passing over magnetized rails at a point two miles south of the tower and starting an electric signal in the tower known as a "buzzer." He notified the despatcher who at once gave him an order for the train to be given a clear track. This order was dictated over the telephone and by him taken down in triplicate on order blanks, signed by him and repeated to the despatcher. He then made out a clearance card which was also made out in triplicate and signed, copies of both to be delivered to the engineer and conductor and one retained by him. He says that while seated at his desk a friend of his named Corder, who was in the tower at the time, informed him that the train was emerging from the cut 600 feet distant and he believed it was "running away," that he glanced out and reached the same conclusion. He immediately threw the switches and also undertook to change the signal, but either worked the signal lever too rapidly or the train had passed too far before he undertook to change that lever, and he was unable to do this, it being shown that after the train reached a certain point within the block the signal stood at danger and could not be changed. By that time the train was passing and he rushed down with his orders in a hoop and handed them to the conductor. The train ran on for about two and one-half miles and stopped while still on a steep down grade. When inspected afterwards the air brakes on the cars seemed all right except as to four cars, this being a sufficient number to pass inspection.

It appears that while northbound trains generally stopped for inspection at KD tower, there was no special point designated for that purpose and when the block was open they frequently passed the switch before doing so. It is also shown that Corder was expecting to ride

this train to Somerset and Wyatt had promised to hold it in the block for him.

In this suit McWhorter recovered a judgment of $20,000.00 against both the railway company and Wyatt. Appellants insist that the court erred in its instructions and in failing to give a peremptory instruction for defendants. It is patent that if any negligence existed it was by reason of defective air brakes or by reason of the failure of Wyatt to discharge some duty devolving on him.

Considering these matters in their order. The air brakes are not shown to have been old or worn or damaged in any way; they were tested before starting and found to be all right. They functioned effectively immediately before and immediately after the accident. If their failure to work at the time mentioned indicates that they were defective, it is not shown that the company knew of such defect or could have learned of same in the exercise of ordinary care. Aside from this if their failure to function at that time could be considered as evidence that they were defective or insufficient, in view of the fact that they were entirely within the control of McWhorter, as well as of the matters mentioned, *supra*, it is equally as consistent to adopt the theory that their failure at that time was produced by some other cause. For instance, when first discovered McWhorter remarked that some one had turned an angle cock and released his air, and there is a theory that this may have been done by tramps; but without pursuing the inquiry further and considering all the circumstances, we do not think that the mere fact that they failed to work at that time was proof of actual negligence by the company, and the court erred to its prejudice in giving instruction No. 3 based on that theory.

Appellees argue that Wyatt at the time of the passage of the southbound train had notice of the approach of McWhorter's train, and was directed by the dispatcher to give it a clear track, and thus had fully four minutes in which to provide for the latter's safety. That he should have first changed the switch and set the signals and then have prepared the orders and clearance card; that failing in this he was guilty of gross negligence.

Appellants contend that as McWhorter's train could not have proceeded without orders and a clearance card,

it was Wyatt's duty to prepare these before opening the switch, and that he was continuously so engaged up to the time the engine emerged from the cut. Further, that as trains generally stop at the tower for inspection, for that reason, as well as for the reasons above indicated Wyatt had a right to rely on this train coming in under control, and the train order imposed no duty upon him as to McWhorter in opening the switch until he learned that the train was approaching without control; that he could not have discovered that sooner, and that thereafter he did everything within his power to avert the danger.

It is clear that Wyatt had no notice of the train not being under control until it emerged from the cut, and that at the rate it was moving the engine reached the semaphore signal post in less than ten seconds thereafter, and the evidence shows that it requires from ten to twelve seconds to manipulate the levers. The direct evidence is that Wyatt did everything within his power to avert the danger after the discovery of plaintiff's peril, and there being no inference to the contrary, it follows that instruction No. 2, submitting an issue on this question, was erroneous.

It remains to be determined if Wyatt failed in any duty.

As all northbound trains received orders at the tower, and none could pass to the single track without such order, as well as the fact that most trains stopped there for inspection, he may have anticipated that this one would come in under such control that it could stop if the signal was against it. It was his duty to prepare the orders and clearance cards for its passage upon the single track, and to open the switch and change the signals. While we could not lay down a general rule in these matters, under the evidence we think the above procedure proper in this case. It seems to have been followed by Wyatt and if he exercised proper diligence in so doing the defendants are not liable. He says he did so, and in this he is to some extent corroborated by Corder, and there is no direct evidence to the contrary.

But there are circumstances in the case from which contradictory inferences may be drawn. He had an order to give this train a clear track and it was his duty to do this without delay. Most, but not all northbound trains stopped at the tower for inspection, but no especial place

was designated for that purpose, and when the track was open engines frequently ran beyond the switch. While all trains had to take orders, if the block was open, those which did not stop could receive the orders from a hoop while passing.

The fact that the company had installed signals a mile apart for the use of northbound trains, and required the signals to be given when the switches were changed, demonstrates that such signals were intended for the guidance of northbound train crews, and they had a right to rely on same as truly indicating the condition of the switches, and the operator in the tower owed them the duty of exercising reasonable diligence in carrying out such orders.

As stated, Wyatt learned of the train's approach when it was two miles distant and immediately notified the dispatcher and received the train order. At that time its speed was from twenty-five to thirty miles an hour, and this was accelerated to from forty to forty-five miles by the time it reached the tower. Averaging the speed, it required at least three minutes or possibly three and a half for the engine to cover that distance, and Wyatt had that time in which to make out the train order and clearance card and operate the switches and signals. It must be remembered that while the order was executed in triplicate, by the use of carbon it was made at one writing and the pads were necessarily at hand.

We have carefully examined the words written in the blanks in this order and clearance card. Under similar circumstances an ordinary penman, using due deliberation might receive such order over the telephone, write it, sign it and repeat it deliberately to the dispatcher and also fill out the words in the blanks of the clearance card in the space of two minutes, and still have from a minute to a minute and a half in which to operate the switches and signals. We do not lay it down as a fact that Wyatt should have done so, but a jury might reasonably so conclude, and in view of the fact that Wyatt was expecting the train to stop anyway, and possibly talking to Corder at the time, he may have been less diligent in the dispatch of these matters than his duty required. At any rate these circumstances were sufficient to authorize a submission of that question to the jury, and therefore a peremptory instruction in favor of the railway company was properly overruled.

The plaintiffs admit that the cargo on McWhorter's train was being transferred from Oakdale, Tennessee, through Kentucky to Cincinnati, Ohio, and such is the evidence. It follows that both McWhorter and Wyatt at the time of the injury were engaged in interstate commerce. The federal act gives no right of action against an individual, consequently Wyatt was improperly joined as a party defendant. Thompson v. C., N. O. & T. P. Ry. Co., 165 Ky. 256; Wells Fargo Co. v. Taylor, 254 U. S. 175.

A joinder of the two creates much difficulty in the procedure; naturally an action against Wyatt is at common law, and the rights, defenses and measure of damages thereunder are distinct from those created by the statute and necessitate a different set of instructions and produce more or less confusion where both are prosecuted in the same action.

No question of misjoinder was raised in the court below, and the objection for misjoinder comes too late when made for the first time in this court. New Bell J. C. Co. v. Braznell's Admr., 149 Ky. 419; Thomas' Extrx. v. Haly Coal Co., 189 Ky. 698, but as the case must be reversed for other reasons, a separate set of instructions should be given to conform to the different issues presented.

Instruction number four as to the measure of damages was based on a common law recovery. In another trial as to the railway company it will be made to conform to the views expressed in the Ohio Valley Electric Ry. Co. v. Brumfield, 180 Ky. 751, and N. C. & St. L. Ry. Co. v. Henry, 158 Ky. 88. The fifth instruction will also be changed to correctly define negligence.

Plaintiff was permitted to read the deposition of Wyatt taken as on cross-examination, and also to prove by several witnesses a conversation with Wyatt in the tower shortly after the occurrence. However, the conversation was in narrative form and we do not consider it a part of the *res gestae*. As admissions of a party this evidence may have been admissible against Wyatt, but we do not think any of it is competent as substantive evidence against the railway company and in another trial the lower court will so rule.

Wherefore, the judgment is reversed and cause remanded for proceedings consistent with this opinion.